# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| **JAMES FARAH,**<br><br>     **Plaintiff,**<br><br>  **v.**<br><br>**LASALLE BANK NATIONAL ASSOCIATION, as Trustee for the WAMU Mortgage Pass-Through Certificates Series 2006-AR7 Trust; JPMORGAN CHASE BANK, N.A. as a Servicer; MORTGAGE ELECTRONIC REGISTRATION SYSTEM; and JOHN DOES 1-10, inclusive,**<br><br>     **Defendants.** | Civ. No. 15-cv-2602 (KM)<br><br>**OPINION** |

**KEVIN MCNULTY, U.S.D.J.:**

James Farah brings this action against Defendants JPMorgan Chase Bank, N.A. ("Chase"), and LaSalle Bank National Association, as Trustee for the WaMu Mortgage Pass-Through Certificates Series 2006-AR7 Trust ("LaSalle as Trustee"),[1] and Mortgage Electronic Registration System ("MERS") (together, the "Defendants"), arising from their allegedly fraudulent conduct in connection with his mortgage loan. These Defendants move for summary judgment on multiple grounds. (DE 168)

The primary issue discussed in this Opinion is the *res judicata* effect of a final judgment in a parallel state-court mortgage foreclosure proceeding. The foreclosure was based on the following facts, as to which there was no

---

[1] Also pending is an appeal (DE 182) from an order of the Magistrate Judge which denied entry of default against LaSalle. In a separate Opinion and Order, filed simultaneously with this one, I have denied that appeal and affirmed Magistrate Judge Hammer's order.

substantial, evidence-backed dispute. Farah took out a loan, secured by a recorded mortgage, with Washington Mutual Bank, FA ("WaMu") in 2006. Farah refinanced that loan with WaMu in 2008. That 2006 loan was satisfied and discharged in connection with the 2008 refinancing. When WaMu failed, its assets were taken over by the FDIC. The FDIC assigned WaMu's loan assets, including the 2008 Farah loan, to Chase. Farah defaulted in 2010, and has made no monthly payments for nearly ten years. For part of this period he occupied the property, and for part of the period he rented out the property for $5300 per month.

I find that the state court's final judgment of foreclosure in favor of Chase is fatal to Farah's claims of "fraud" in this action. *See* Section III.A, *infra*. In the alternative, I briefly discuss Defendants' other proffered grounds for summary judgment. *See* Section III.B, *infra*.

For the reasons stated herein, the Defendants' motion for summary judgment is GRANTED.

## I.    Background and Procedural History[2]

Facts common to the various actions described in this section, either established by uncontradicted documents or admitted by the plaintiff, are as follows.

Mr. Farah and his spouse, Julia Farah, are the owners of a residential property at 522A Green Village Road, Green Village, County of Morris, NJ. (*See* Amended Complaint ("AC") ¶ 1.) (For convenience, I refer to them together as "Farah".) On April 26, 2006, Farah entered into a residential loan (the "2006

---

[2]    Certain items of record are abbreviated as follows:

| "Berg Dec." | = Declaration of James P. Berg (DE 168-2) |
| "Grageda Cert." | = Certification of Evan L. Grageda (DE 168-3) |
| "2018 SJ Op." | = Decision of Judge Maritza-Byrne, P.J. Ch., granting summary judgment in 2018 mortgage foreclosure (Berg Decl. Ex. J, DE 168-12) |

loan"), evidenced by a note and secured by a mortgage with Washington Mutual Bank, FA ("WaMu").

On January 17, 2008, Farah paid off the 2006 loan in connection with refinancing the mortgage with WaMu (the "2008 loan"). (Gregada Cert. ¶¶ 3, 4; *see also* Berg Decl. ¶ 4.) On September 25, 2008, Chase purchased assets of WaMu, including this loan, out of FDIC receivership. (DE 13-8 at 4; *see also* Gregada Cert. ¶¶ 5, 12, AC ¶¶ 17–21.) Farah admittedly has made no monthly payments on the mortgage since 2010, despite operating the premises as a rental property for some part of that time.

### A. State Mortgage Foreclosure Actions (Background)
#### 1. 2014 Foreclosure Action

On February 27, 2014, JP Morgan commenced a mortgage foreclosure proceeding (the "2014 foreclosure action") in the Superior Court of New Jersey, Morris County (No. F-7425-14). Farah filed a contesting answer and counterclaims. (Berg Decl. ¶ 5.)

On October 27, 2014, the state court awarded summary judgment, struck the answer, and deemed the foreclosure action uncontested. (Berg Decl. ¶ 6.) Judge Stephan C. Hansbury ordered, in accordance with state procedure, that the action be transferred to the foreclosure unit to proceed to final judgment as an uncontested matter.[3] For reasons that are unclear, the

---

[3]     New Jersey is a judicial foreclosure state. At least where a contesting answer is filed, the case begins its journey in the Superior Court. Defenses and counterclaims are heard or disposed of there, typically on summary judgment. Such defenses include, *e.g.,* payment and discharge, failure of consideration, incorrect computation of the amounts due, fraud, mistake, waste, credit for rental value of the mortgaged premises, usury, unjust enrichment, setoff, recoupment, non-compliance with regulatory pre-requisites to foreclosure, and abatement of the mortgage debt. A range of defenses and counterclaims are appropriately heard, but they must be "germane" to the mortgage foreclosure. *See LaSalle Nat. Bank v. Johnson*, No. F-12888-05, 2006 WL 551563, at *2 (N.J. Super. Ct. Ch. Div. Mar. 3, 2006) (citing Scott T. Tross, New Jersey Foreclosure Law and Practice § 1 at 162-65 (2001)); *see also* S.B. Pressler & P.G. Verneiro, N.J. Ct. R. annot.  4:64-1, comment 3.3.

foreclosure action was thereafter administratively terminated without prejudice, for want of prosecution.[4]

In April–May 2016, JP Morgan moved to reinstate the 2014 foreclosure action. Mr. Farah then filed a notice of removal of the foreclosure action to this Court. *See* Civ. No. 16-cv-3056. By order and opinion dated December 16, 2016, I found that there was no basis for federal jurisdiction and remanded the foreclosure to the State court. On February 1, 2018, however, Chase voluntarily discontinued the 2014 foreclosure action without prejudice. (Berg Decl. ¶ 7)

### 2. **2018 Foreclosure Action and Summary Judgment Decision**

Shortly thereafter, on May 23, 2018, Chase filed a new foreclosure action (the "2018 foreclosure action") in the Superior Court of New Jersey, Morris County (No. F-001096-18). Despite the prior remand for lack of jurisdiction, Mr. Farah again filed a notice of removal of the foreclosure action to this Court. On February 27, 2019, I adopted the Report and Recommendation of Magistrate Judge Hammer that removal was procedurally defective, and in the alternative that federal jurisdiction was lacking, and I again remanded the foreclosure case to state court. (18cv13946 DE 16; Berg Decl. ¶ 11)

On July 15, 2019, the Hon. Maritza Berdote-Byrne, P.J. Ch., entered an order and statement of reasons in the 2018 foreclosure action granting Chase's motion for summary judgment, striking Farah's answer, and referring the case to the Office of Foreclosure to proceed as an uncontested matter. (Berg Decl. ¶

---

If the defenses survive summary judgment review, the action is "contested"; if not, it is deemed "uncontested" and may be referred to the Office of Foreclosure. An uncontested action is one in which (1) all defendants have failed to answer or plead; or, more relevant here, "(2) none of the pleadings responsive to the complaint either contest the validity or priority of the mortgage or lien being foreclosed or create an issue with respect to plaintiff's right to foreclose it; or (3) all the contesting pleadings have been stricken or otherwise rendered noncontesting." N.J. Ct. R. 4:64-1(c).

[4]    For context, I note that it was on April 10, 2015, that the plaintiff filed this federal-court action.

12 Ex. J, DE 168-12 "2018 SJ Op.") (*See* p.3 n.3, *supra*.) Summary judgment was vigorously contested, and Judge Berdote-Byrne memorialized her ruling striking affirmative defenses and counterclaims in a thorough written opinion. (The 2018 SJ Op. is discussed in more detail at Section III.A.1.a, *infra*.)

In addition, Judge Berdote-Byrne found that Farah, while paying nothing on the mortgage, had been collecting $5300 per month in rent on the mortgaged property. She therefore granted Chase's motion for appointment of a rent receiver, subject to Farah's representation that he soon planned to reoccupy the property himself, which he has apparently done. (2018 SJ Op. at 18–20)

There matters stood, so far as this Court was aware, until a recent status update documenting that the 2018 Foreclosure Action had proceeded to final judgment. *See* Section I.C, *infra*.

### B. This Federal Court Action (Background)

On April 10, 2015, Farah filed the original complaint in this action. (DE 1) In an opinion and order dated March 23, 2016, I partially granted and partially denied the Defendants' motion to dismiss the original complaint, without prejudice to amendment. (DE 31, 32)

On May 23, 2016, Farah filed the currently operative Amended Complaint. (AC, DE 39). The sixteen causes of action pled in the original complaint are here pared down to a single "CAUSE OF ACTION-FRAUD." (AC ¶¶ 117–18) The factual allegations, though shortened, follow the same general outline as the original. The allegations of the AC are complex and at times hard to follow. In summary form, they are as follows.

The AC describes the 2006 WaMu loan and mortgage, notes that WaMu went out of business, and states that on September 25, 2008, Chase purchased the (2008) WaMu loan from the FDIC. (AC ¶¶ 17–21.) The 2006 note and mortgage were securitized and place in a trust having LaSalle National

Bank as trustee, an arrangement which was "never disclosed" to Farah until after the summary judgment ruling in the 2014 foreclosure action. (AC ¶¶ 26, 29.) Chase "split the note for a second time in 2008." (AC ¶ 27.) WaMu did not exercise due diligence and made a loan to Farah that he could not afford. (AC ¶¶ 33–38.)

The AC then summarizes proceedings in the 2014 foreclosure action. Much of the discussion is devoted to disputes over representation, discovery disputes, the lack of a final judgment, and the inapplicability of *Rooker-Feldman.* (AC ¶¶ 39–73.) The AC then accuses counsel of "perjury" and raises various other procedural objections to the 2014 foreclosure action and its reinstatement following dismissal. (AC ¶¶ 74–117.) The 2014 action, however, was voluntarily dismissed.

The AC, under the heading "Cause of Action – Fraud," then picks up with a series of allegations about the securitization and assignment of the loan. The thrust of the allegations is that Chase does not own the loan and therefore cannot foreclose on it.

 The AC recites that the loan (the 2006 loan, apparently) was securitized three times (in 2006, 2008, and 2010). As part of that process, it was assigned to a REMIC trust, overseen by a trustee, with the income stream from mortgages flowing to investors. That assignment, according to the AC, was defective, particularly under the terms of the Pooling and Servicing Agreement ("PSA"). (AC ¶¶ 118–29.) As a result, "the trust does not hold title on the loan and therefore cannot foreclose." (AC ¶ 127.) (Chase, not the Trust, was the plaintiff in the foreclosure action.)

The AC also cites three alleged assignments of Farah's mortgage (the 2006 loan, apparently) as being fraudulent.[5]

---

[5]    Defendants point out that these three assignments, which the AC cites by date and Instrument Number in the Morris County Clerk's Office records, do not appear there. The cited documents are not assignments of mortgage, and they do not relate to

The AC describes "Assignment of Mortgage 1," recorded August 16, 2012, from FDIC to Chase. This assignment, according to the AC, is both belated and defective. During this period, when Farah was attempting to negotiate a short sale with Chase, Chase failed to produce to him the original note. (AC ¶¶ 130–57.)

The AC describes "Assignment of Mortgage 2," recorded June 4, 2014, to Bayview Loan Servicing, LP. This assignment, too, plaintiff alleges, was void; a "REMIC Trust in the LaSalle System," not Chase, owed the loan, and at any rate there "are so many new parties to this loan" that discovery should be granted. (AC ¶¶ 158–71.)

The AC then describes "Assignment of Mortgage 3," recorded June 24, 2014. This, according to plaintiff, duplicates Assignment 2. Plaintiff suggests perjury in that one Cynthia Riley was not an employee of WaMu as claimed when Farah entered into his 2008 loan. He alleges that two separate payments of $315,495 were deposited into his Chase account, a fact which suggests to him that a third securitization must have occurred in 2010, in a manner that was not disclosed to Farah. (AC ¶¶ 172–86)

By Opinion and Order filed February 16, 2017 (DE 63), I denied the Defendants' motion to dismiss the AC, in order to permit factual development in discovery:

> These are matters of fact that may be definitively cleared up with the benefit of a relatively small amount of discovery and disposed of on summary judgment, one way or the other. *Many of these issues might also be mooted by developments in the foreclosure action.* I will therefore deny the motion to dismiss.

(DE 63 at 2–3; *emphasis* added.)

---

the properties at issue. (Berg. Decl. ¶ 14 and Exs. L–N, DE 168-14, 15, 16.) Further, an abstract of Morris County records on which the name James Farah appears does not yield any reference that appears to correspond to the three assignments cited in the AC. (*Id.* Ex. O, DE 168-17; *see also* Section III.B.3, *infra.*)

The matter has now proceeded through fact discovery.

## C. This Summary Judgment Motion and Final Judgment in the 2018 Foreclosure Action

On August 9, 2019, Defendants filed the motion for summary judgment that is now before the Court. (DE 168.) The grounds originally asserted were many. Defendants asserted that the claims are barred by the FIRREA statute and the Purchase and Assumption ("P&A") Agreement; statute of limitations and inadequacy of factual allegations as to fraud; plaintiff's lack of standing to challenge the securitization or assignment of his loans; Chase's actual ownership of the loan; *Younger* and *Colorado River* abstention; and the improper naming of MERS as a party. (DE 168-1 (Defendants' summary judgment brief).) This summary judgment motion did not, like its predecessor, assert *res judicata.* Presumably that omission reflected the Court's prior ruling that there was not yet a final judgment in the state foreclosure action(s), a prerequisite to the application of either *Rooker-Feldman* or claim preclusion doctrines. Mr. Farah filed papers in opposition (DE 173), and Defendants filed a reply. (DE 174.)

Uncertain about the status of the state proceedings, I requested an update by text order filed March 25, 2020. (DE 187.) In response, counsel for Defendants filed a copy of the Final Judgment and Writ of Execution that had recently been filed, on February 19, 2020, in the 2018 foreclosure action. (DE 188-1.)

On March 27, 2020, I entered a second text order, which read as follows:

PROCEDURAL ORDER that the parties shall submit supplemental briefs, not to exceed 10 pages, on the issues of res judicata and New Jersey's entire controversy rule, taking into account that the state judgment is final; such briefing may refer to exhibits already filed, without the need for refiling; Defendants brief shall be filed on or before April 20, 2020, and any responding brief by plaintiff shall be filed on or before May 11, 2020. No reply brief is authorized without further leave of the court; the motion for summary judgment (DE 168) is otherwise ADMINISTRATIVELY

> TERMINATED without prejudice. It will be reinstated by order of the court if and to the extent necessary in light of the resolution of the res judicata issue.

(DE 189.) In essence, these were the predictable "developments in the foreclosure action" to which I had referred in my prior opinion. (*See* p. 7, *supra*, citing DE 63 at 2–3.)

On April 17, 2020, Defendants filed a brief and supplemental declaration addressing the issues of *res judicata* and the entire controversy doctrine in light of the now-final judgment in the 2018 foreclosure action. (DE 190.)

As noted, Defendants had already submitted a copy of that final judgment in the 2018 foreclosure action. (DE 188-1.) To provide additional context, Defendants submitted copies of the following state-court pleadings:

1. Order and statement of reasons by Judge Berdote-Byrne, dated January 28, 2020, denying Farah's motion for reconsideration of summary judgment and objections to calculation of amount due, and returning the matter to the Office of Foreclosure. (DE 190-2.)

2. Order and statement of reasons of Judge Berdote-Byrne, dated February 19, 2020, denying Farah's motion to dismiss the foreclosure complaint for lack of jurisdiction. (DE 190-3.)

On May 11, 2020, Farah filed his supplemental submission in opposition to the application of *res judicata* or the entire controversy rule. (DE 191.) The most pertinent of his arguments is that the state court judgment, because subject to reconsideration or appeal, is not "final" for these purposes.

## II.   Summary Judgment Standard

Federal Rule of Civil Procedure 56(a) provides that summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *See Kreschollek v. S. Stevedoring Co.*, 223 F.3d 202, 204 (3d Cir. 2000); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In deciding a motion for summary judgment, a court must construe all facts and inferences in the

light most favorable to the nonmoving party. *See Boyle v. Cnty. of Allegheny Pennsylvania*, 139 F.3d 386, 393 (3d Cir. 1998) (citing *Peters v. Delaware River Port Auth. of Pa. & N.J.*, 16 F.3d 1346, 1349 (3d Cir. 1994)). The moving party bears the burden of establishing that no genuine issue of material fact remains. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23. "[W]ith respect to an issue on which the nonmoving party bears the burden of proof . . . the burden on the moving party may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325.

Once the moving party has met that threshold burden, the non-moving party "must do more than simply show that there is some metaphysical doubt as to material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986). The opposing party must present actual evidence that creates a genuine issue as to a material fact for trial. *Anderson*, 477 U.S. at 248; see also Fed. R. Civ. P. 56(c) (setting forth types of evidence on which nonmoving party must rely to support its assertion that genuine issues of material fact exist).

Unsupported allegations, subjective beliefs, or argument alone, however, cannot forestall summary judgment. *See Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888, 111 L. Ed. 2d 695, 110 S. Ct. 3177 (1988) (nonmoving party may not successfully oppose summary judgment motion by simply replacing "conclusory allegations of the complaint or answer with conclusory allegations of an affidavit."); *see also Gleason v. Norwest Mortg., Inc.*, 243 F.3d 130, 138 (3d Cir. 2001) ("A nonmoving party has created a genuine issue of material fact if it has provided sufficient evidence to allow a jury to find in its favor at trial."). Thus, if the nonmoving party fails "to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial . . . there can be 'no genuine issue of material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial."

*Katz v. Aetna Cas. & Sur. Co.*, 972 F.2d 53, 55 (3d Cir. 1992) (quoting *Celotex*, 477 U.S. at 322–23).

Moreover, the "mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson*, 477 U.S. at 247–48. A fact is only "material" for purposes of a summary judgment motion if a dispute over that fact "might affect the outcome of the suit under the governing law." *Id.* at 248. A dispute about a material fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

Mr. Farah's response to the motion for summary judgment does not comply with Rule 56 as implemented by this district's local rules. If a party fails to address the other party's properly supported assertion of fact, the court may consider "grant[ing] summary judgment if the motion and supporting materials—including the facts considered undisputed—show that the movant is entitled to it . . . ." Fed. R. Civ. P. 56(e). Local Civil Rule 56.1(a) deems a movant's statement of material facts undisputed where a party does not respond or file a counterstatement. L. Civ. R. 56(a).  A failure to dispute a party's statement of material facts, however, "is not alone a sufficient basis for the entry of a summary judgment"; even where a local rule deems unopposed motions to be conceded, a court must still analyze the motion under the standard prescribed by Fed. R. Civ. P. 56(e)). *Anchorage Assocs. v. Virgin Islands Bd. of Tax Review*, 922 F.2d 168, 175 (3d Cir. 1990) (holding that even where a local rule deeming unopposed motions to be conceded, the court was still required to analyze the movant's summary judgment motion under the standard prescribed by Fed. R. Civ. P. 56(e)). "In order to grant Defendant's unopposed motion for summary judgment, where, as here, 'the moving party does not have the burden of proof on the relevant issues, . . . the [Court] must determine that the deficiencies in [Plaintiff's] evidence designated in or in connection with the motion entitle the [Defendants] to judgment as a matter of

11

law.'" *Muskett v. Certegy Check Servs., Inc.*, Civ. No. 08-3975, 2010 WL 2710555 (D.N.J. July 6, 2010) (quoting *Anchorage Assocs.*, 922 F.2d at 175)). "Accordingly, where a properly filed and supported summary judgment motion is unopposed, it would be an exceptional case where the court concludes that summary judgment should nonetheless be denied or withheld, although the Court has discretion to do so if unsatisfied that the law and facts point to judgment as a matter of law." *Ruth v. Selective Ins. Co. of Am.*, No. CV 15-2616 (JBS/JS), 2017 WL 592146, at *3 (D.N.J. Feb. 14, 2017).

I observe, however, that Mr. Farah, although originally represented by counsel, currently appears pro se. "Where the plaintiff is a pro se litigant, the court has an obligation to construe the complaint liberally." *Giles v. Kearney*, 571 F.3d 318, 322 (3d Cir. 2009) (citing *Haines v. Kerner*, 404 U.S. 519, 520–521 (1972); *Gibbs v. Roman*, 116 F.3d 83, 86 n. 6 (3d Cir. 1997)). I have extended that liberal spirit of review to Mr. Farah's papers on this summary judgment motion.

## III. Analysis

### A. *Res Judicata*[6] Doctrines

The preclusive effect of a state court judgment in a subsequent federal action is governed by the law of the state that adjudicated the prior action. *See Greenleaf v. Garlock, Inc.*, 174 F.3d 352, 357 (3d Cir.1999) ("To determine the preclusive effect of [the plaintiff's] prior state action we must look to the law of the adjudicating state."). *See also Allen v. McCurry*, 449 U.S. 90, 96, 101 S. Ct. 411, 415 (1980) ("Congress has specifically required all federal courts to give preclusive effect to state-court judgments whenever the courts of the State from which the judgments emerged would do so."). Here, that State is New Jersey.

### 1. Claim preclusion/Entire controversy

---

[6] I use "*res judicata*" here to refer to the preclusion doctrines generically. For clarity, I note that New Jersey courts sometimes use the term more narrowly as a synonym for claim preclusion.

New Jersey claim preclusion law, like federal law, has three essential elements: (1) a final judgment on the merits; (2) the prior suit involved the same parties or their privies; and (3) the subsequent suit is based on the same transaction or occurrence. *Watkins v. Resorts Int'l Hotel and Casino, Inc.*, 124 N.J. 398, 412, 591 A.2d 592, 599 (1991) (state law); *United States v. Athlone Indus., Inc.*, 746 F.2d 977, 983 (3d Cir. 1984) (federal law). If those three requirements are met, then the doctrine bars "the parties or their privies from relitigating issues that were or could have been raised in that action." *Allen,* 449 U.S. at 94, 101 S. Ct. at 414; *Watkins*, 124 N.J. at 412, 591 A.2d at 599 ("Claim preclusion applies not only to matters actually determined in an earlier action, but to all relevant matters that could have been so determined.")

Claim preclusion in the traditional sense, however, tends to be subsumed by New Jersey's "entire controversy" rule. *See* N.J. Ct. R. 4:30A. The entire controversy rule emphasizes, not just claims within the scope of the prior judgment, but all claims that a party could have joined in a prior case based on the same transaction or occurrence. The entire controversy doctrine thus "requires a party to bring in one action 'all affirmative claims that [it] might have against another party, including counterclaims and cross-claims' . . . or be forever barred from bringing a subsequent action involving the same underlying facts." *Rycoline Prods., Inc. v. C & W Unlimited*, 109 F.3d 883, 885 (3d Cir. 1997) (quoting *Circle Chevrolet Co. v. Giordano, Halleran & Ciesla*, 142 N.J. 280, 662 A.2d 509, 513 (1995)).

> We have described the entire controversy doctrine as "New Jersey's specific, and idiosyncratic, application of traditional res judicata principles." *Rycoline Prods., Inc. v. C & W Unlimited*, 109 F.3d 883, 886 (3d Cir. 1997). A mainstay of New Jersey civil procedure, the doctrine encapsulates the state's longstanding policy judgment that "the adjudication of a legal controversy should occur in one litigation in only one court[.]" *Cogdell v. Hosp. Ctr. at Orange*, 560 A.2d 1169, 1172 (N.J. 1989); *see also* N.J. Const. art. VI, § 3, ¶ 4 ("[L]egal and equitable relief shall be granted in any cause so that all matters in controversy between the parties may be completely determined."); *Smith v. Red Top Taxicab Corp.*, 168 A. 796, 797 (N.J. 1933) ("No principle of law is more firmly established than

that a single or entire cause of action cannot be subdivided into
several claims, and separate actions maintained thereon.")

*Ricketti v. Barry,* 775 F.3d 611, 613 (3d Cir. 2014).

In particular, the state entire controversy doctrine applies in federal
court "when there was a previous state-court action involving the same
transaction." *Bennun v. Rutgers State Univ.*, 941 F.2d 154, 163 (3d Cir. 1991).
It extinguishes any subsequent federal-court claim that could have been
joined, but was not raised in the prior state action:

> Under the entire controversy doctrine, a party cannot withhold
> part of a controversy for separate later litigation even when the
> withheld component is a separate and independently cognizable
> cause of action. The doctrine has three purposes: (1) complete and
> final disposition of cases through avoidance of piecemeal decisions;
> (2) fairness to parties to an action and to others with a material
> interest in it; and (3) efficiency and avoidance of waste and delay.
> *See DiTrolio v. Antiles,* 142 N.J. 253, 662 A.2d 494, 502 (N.J.1995).
> As an equitable doctrine, its application is flexible, with a case-by-
> case appreciation for fairness to the parties.

*Paramount Aviation Corp. v. Agusta*, 178 F.3d 132, 137 (3d Cir. 1999).

   *a)  Same transaction or claims*

The key to both doctrines is that the two actions arise from the same
transaction, such that the current claims either were or could have been
brought in the earlier action. I discuss this critical factor first.

Claim preclusion and the entire controversy doctrine extinguish any
subsequent federal-court claim that was asserted and decided in the earlier
action. They also extinguish claims that could have been asserted and decided
in the prior action. Claims that could have been asserted and decided in a
foreclosure action are limited to those that are deemed "germane"—*i.e.,* "claims
arising out of the mortgage transaction which is the subject matter of the
foreclosure action." *Leisure Technology–Northeast v. Klingbeil Holding Co.*, 137
N.J. Super. 353, 349 A.2d 96, 98–99 (App. Div. 1975). The claims pressed here

by Farah would surely have been deemed "germane" to a foreclosure action; all implicate Chase's very right and entitlement to foreclose.[7]

There is little need, however, to resort to the "could have been asserted" prong of claim preclusion and the entire controversy doctrine. As Defendants point out, the claims in the amended complaint here may be summarized very roughly as follows: (1) alleged wrongdoing relating to the origination of two loans issued to him by WaMu, in 2006 and in 2008; (2) alleged violations of the P&A Agreement between Chase and the FDIC; (3) claims regarding three alleged assignments of the mortgage for the 2006 loan; and (4) alleged issues regarding securitization of the 2006 loan. All arose before the 2018 foreclosure action was filed. The claims in this federal action surely could have been considered in the 2018 foreclosure action; more to the point, however, they were *actually* considered and rejected by the state court on summary judgment in the course its arriving at a final judgment of foreclosure.

---

[7]     *See also* N.J. Ct. R. 4:30A (codifying the preclusive effect of the entire controversy rule, "except as otherwise provided by R. 4:64-5 (foreclosure actions)," which contains the germaneness requirement for mortgage foreclosure actions); *Zebrowski v. Wells Fargo Bank, N.A.*, No. CIV.1:07CV05236JHR, 2010 WL 2595237, at *6 (D.N.J. June 21, 2010) (Rodriguez, J.); *Joan Ryno, Inc. v. First Nat. Bank of S. Jersey*, 208 N.J. Super. 562, 570, 506 A.2d 762, 766 (App. Div. 1986).

In *Coleman v. Chase Home Fin., LLC ex rel. Chase Manhattan Mortgage Corp.*, 446 F. App'x 469 (3d Cir. 2011), Judge Fuentes considered the *res judicata* effect of a final judgment in a foreclosure action. After bankruptcy-related delays that staved off a sheriff's sale, the borrower/owner paid a reinstatement fee and obtained a dismissal of the foreclosure. The borrower then brought a putative class action in federal court, claiming, *inter alia,* that the lender had charged excessive fees in connection with reinstatement. Judge Fuentes barred the federal claims, finding that they would have been "germane," and hence assertable, in the state case. The precluded federal court causes of action in *Coleman* included (1) breach of contract; (2) intentional misrepresentation; (3) negligence; (4) breach of duty of good faith and fair dealing; (5) unjust enrichment; (6) unfair and deceptive assessment and collection of fees; (7) violation of the Fair Foreclosure Act ("FFA"); (8) excessive fees in violation of New Jersey Court Rule R 4:42–9(a)(4); (9) excessive taxed costs in violation of various state statutes; (10) violation of New Jersey's Consumer Fraud Act ("CFA"); (11) forfeiture of interest; and (12) violation of the Truth–In Consumer Contract, Warranty and Notice Act.

On July 15, 2019, the Hon. Maritza Berdote-Byrne, P.J. Ch., entered an order and statement of reasons granting Chase's motion for summary judgment in the 2018 foreclosure action; simultaneously, she denied Farah's motion to dismiss the foreclosure and motion for leave to file a third-party complaint against the FDIC. (Berg. Decl. ¶¶ 12–13 & Exs. J, K, DE 168-1, 168-12, 168-13.)

On summary judgment, Judge Berdote-Byrne found the following facts to be uncontested in the evidence. (Berg Decl. Ex. J, DE 168-12, "2018 SJ Op.") Chase had submitted a true and correct copy of the 2008 note and mortgage. WaMu, the mortgagee, had failed in 2008, and its assets were taken over by the FDIC. (2018 SJ Op. at 3–4.) Chase bought WaMu assets, including the 2008 mortgage. (*Id.* at 4.) The assignment of the mortgage from FDIC to Chase was recorded on December 22, 2014. Farah defaulted on monthly payments as of August 1, 2010 and had not made any payments since. (*Id.* at 4–5.) Judge Berdote-Byrne then reviewed the history of state and federal court litigation.

Farah's chief contention in the 2018 foreclosure action, Judge Berdote-Byrne noted, was that Chase did not own the 2008 mortgage and had no standing to foreclose as the result of a course of fraudulent conduct. (*Id.* at 6.) A foreclosure, she noted, requires the mortgagee to establish "(1) the validity of the documents; (2) the default itself; and (3) the right to foreclose"—in particular, that the foreclosing party "own or control the underlying debt." (*Id.* at 6–7 (citations omitted).) She reviewed the UCC principles of negotiation of a note. She stated that the note was endorsed in blank, *i.e.,* payable to the bearer, and so Chase's possession of it was sufficient to confer standing. In the alternative, Judge Berdote-Byrne held that Chase possessed standing as the last recorded assignee. (*Id.* at 7–8.)

Judge Berdote-Byrne then reviewed Farah's "arguments in relation to standing and fraud to determine if they create any genuine issue of material fact as to [Chase's] standing and right to foreclose." (*Id.* at 8.) Lest there be any doubt, the judge specifically noted that these allegations were the very ones

asserted "in the DNJ lawsuit," *i.e.*, this action. (*Id.*) The bulk of Farah's allegations, she noted, did not relate to the 2008 loan at all; they had to do with its predecessor, the 2006 loan, which Farah refinanced in 2008. As to the 2008 loan, the relevant assignment was the one from FDIC to Chase, recorded December 22, 2014; that assignment, she held, was not so much as mentioned in the federal amended complaint.

As for Farah's contention that the "original" note is missing or doubtful, Judge Berdote-Byrne held as follows. There were, she found, two notes executed, a state of affairs for which there was no real explanation. The terms of the two, however, are identical. Both are executed by Farah. The judge held that this issue was therefore immaterial. (*Id.* at 9–10.) Chase certified that the original was in its possession, and produced a certified copy of the note, which the court found adequate as proof of possession. (*Id.* at 11.) In response, Farah cast aspersions of fraud, but offered no countervailing evidence.

Judge Berdote-Byrne next considered Farah's contention that the FDIC never truly assigned the mortgage to Chase, but only "agreed to agree" to do so in the P&A Agreement. She concluded, and held, that this was a genuine and effective agreement to convey WaMu's assets, including the Farah 2008 mortgage, to Chase. The P&A agreement required a receiver's deed of bill of sale only "as necessary"; it did not make such documentation a precondition of transfer. This ordinary transfer by recorded assignment was effective under New Jersey law. (*Id.* at 10–11.)

As for default, Farah did not dispute that he had not made a monthly payment anytime from August 1, 2010, forward. He merely disputed that the mortgage was valid or that Chase had standing to foreclose. (*Id.* at 11.)

As for the basic validity of the note and mortgage, the Court found that Farah had admittedly signed mortgage documents in 2008, and that a notary had witnessed his execution of them. (*Id.* at 12) Chase had sent a notice of intent to foreclose, a requirement under New Jersey law. (*Id.*)

Judge Berdote-Byrne next considered Farah's contesting answer, affirmative defenses, and counterclaims. (*Id.* at 13–18.) Several were not supported by any briefing or factual submissions, and thus were stricken at the outset.[8]

Six affirmative defenses related to Farah's standing arguments. For the reasons already stated, these were stricken.

One affirmative defense concerned joinder of the FDIC as a necessary party. This was stricken. (Elsewhere the court denied the motion to join the FDIC.) (*Id.* at 13.)

Two defenses concerned allegedly usurious interest rates. These were stricken, as the fixed rate of 5.75% and the maximum adjustable rate of 10.75% were well within the maximum under New Jersey law. (*Id.* at 13–14, citing N.J. Stat. Ann. § 2C:21-19.)

Affirmative defense 19 asserted "fraud" in that Chase had failed to disclose material facts about the loans, including their terms and the subsequent securitizations. This defense was stricken as well. (*Id.* at 14.)

Affirmative defenses 20 (defective notice of intent to foreclose), 24 (illegal charges), 28 (failure to attach necessary documents to complaint), and 29 (failure to provide information about New Jersey foreclosure mediation program) were likewise stricken. (*Id.* at 14–15.)

Affirmative defense 31 (estoppel based on conduct in the 2014 foreclosure action) was stricken. The court declined to fault Chase for dismissing a flawed action and returning to court once it had secured the original note and ensured that the final assignment was recorded. (*Id.* at 15–16.)

Judge Berdote-Byrne next turned to Farah's counterclaims. (*Id.* at 16.)[9]

---

[8]    Under local practice, defenses are stricken if the record lacks evidence sufficient to create a material, disputed issue of fact. The analysis is performed under a summary judgment standard. *See* p. 3 n. 3, *supra*.

[9]    A copy of Farah's answer, defenses, and counterclaims was submitted in connection with the removal and motion to remand. (18cv13946, DE 2-3.)

Counterclaims 1, 4, 5, and 6 alleged various forms of fraud and violation of the New Jersey Consumer Fraud Act, noting in particular Chase's role in a "mortgage securitization scheme" and the filing of a foreclosure action based on "improper documentation." The court had already dealt with the evidence of these contentions, *see supra,* and also found that fraud had not been alleged with particularity. These counterclaims were stricken. (*Id.* at 16–17.)

The second counterclaim alleged breach of contract, consisting of the alleged destruction of basic title documents. "The court ha[d] already found the note, mortgage, and assignment of mortgage produced by plaintiff in this case to be sufficient." (*Id.* at 17.) It therefore struck this counterclaim.

The third counterclaim, for negligence did not rise above the level of conclusory allegations and was therefore struck. (*Id.* at 17.)

The seventh counterclaim, for "defamation of credit," necessarily fell because the court had found that Chase had a right to foreclose and that Farah had defaulted on the mortgage. It was stricken. (*Id.* at 17–18.)

In sum, Judge Berdote-Byrne held that "[Chase's] motion for summary is **GRANTED** and the Answer, affirmative defenses, and Counterclaims of [Farah] are **STRICKEN**. The matter will be referred to New Jersey's Office of Foreclosure to proceed as an uncontested foreclosure matter." (*Id.* at 18.)

In a separate opinion, Judge Berdote-Byrne denied Farah's motion to dismiss the complaint. She also denied Farah's motion to file a third-party complaint against the FDIC, both because it was procedurally deficient and as a matter of discretion. (DE 168-13.)

Nor was that the end of it. Farah filed a motion for reconsideration and objection to the calculation of the amount due. On January 28, 2020, Judge Berdote-Byrne filed an order and statement of reasons denying that application. (DE 190-2.) She rejected Farah's contention that the existence of two originals of the note evidenced "fraud" or an intent to collect double payment; there was no evidence, she held, of any attempt to do so. The recorded mortgage and assignment, moreover, provided an alternative basis for

standing. The objections to withdrawal of the 2014 foreclosure action and refiling of the 2018 action, she wrote, had already been dealt with. Objections that Chase had failed to respond to discovery requests, she held, came too late and were not supported by specifics. Citing the equities, she noted that this valid mortgage had been in default since 2010.

Farah asserted that the claimed amount due under the mortgage in the judgment was incorrect. The court rejected his submission because it failed to comply with the requirement of specific evidence under N.J. Ct. R. 4:64-2. The court returned the matter to the Office of Foreclosure to proceed as an uncontested matter.

Finally, Judge Berdote-Byrne denied Farah's last-ditch motion to dismiss the foreclosure complaint for lack of jurisdiction. She found the arguments "nonsensical" and also found the objection to have been waived by Farah's participation in the case. She cautioned Farah that any further submissions repeating the same arguments the court had considered several times would be subject to sanctions. (DE 190-3.)

To summarize, there is no doubt that the judgment in the 2018 foreclosure action encompassed the very matters asserted in this federal action. Farah's defenses and counterclaims in the state foreclosure action asserted "fraud" for the very reasons asserted here. Indeed, Judge Berdote-Byrne's summary judgment decision explicitly cited the claims asserted in this federal action, going so far as to directly compare the state-court issues to the amended complaint already pending in this Court. The alleged fraud in connection with securitization, the alleged defects in the assignments or chain of title, Chase's allegedly fraudulent pursuit of foreclosure on a loan it did not own—all these issues were laid to rest by the state court judgment. *A fortiori,* these are matters that arise from and are germane to the subject matter of the 2018 foreclosure action, and could have been asserted there, even if they had not been. Whether on a claim preclusion or entire controversy theory, the necessary transactional connection between the two actions is present.

b)  *"Final" judgment*

On February 19, 2020, the state court entered its final judgment of foreclosure in the sum certain of $1,4442,701.38, plus fees, and writ of execution. (DE 188-1.) It followed exhaustive, highly contested proceedings. It is titled "FINAL JUDGMENT." It directs that the premises be sold for debt and forecloses the Farah's equity of redemption. It is accompanied by a writ of execution commanding the County Sheriff to auction the property. (*Id.*) the judgment is final on its face.

Mr. Farah objects that this judgment was nevertheless not "final" for *res judicata* purposes, because Judge Berdote-Byrne "invited" him to move again for reconsideration. Such an invitation could conceivably bear on the finality of a judgment in a proper case, but I find that here it does not. The "invitation," contained in the judge's decision denying Farah's post-summary judgment motion to dismiss the complaint, is anything but inviting:

> If defendants [*i.e.,* Mr. and Mrs. Farah], in good faith can produce additional facts not already provided in their motion for reconsideration and opposition to summary judgment, defendants may do so by way of motion for reconsideration or through the appeal process. Accordingly, defendants' motion to dismiss is DENIED. Defendants are on notice if they file a motion raising the same legal arguments and attaching the same evidence as in their previous moving and opposition papers, they may be subject to sanctions. The court has reviewed defendants' arguments and alleged evidence several times and found them to be lacking. The court rules do not provide defendants the opportunity to continue to re-litigate the same issues.

(DE 190-3.) This was the same decision in which the judge found Farah's arguments to be "nonsensical." This so-called invitation signifies little beyond a salutary statement of judicial patience—a general willingness to consider arguments provided they were not "nonsensical" or repetitive. To my mind, it does not indicate that the judgment, already reaffirmed after one motion for

reconsideration, was in any way tentative or interlocutory. There is no hint that the judgment was not final.[10]

Mr. Farah adds that the judgment is not final because it is subject to appeal. Again, I disagree. The New Jersey case law does not hold that an anticipated or pending appeal renders a judgment non-final for *res judicata* purposes. Though sparse, it indicates the opposite. Under the approach of the Restatement (Second) of Judgments, which New Jersey follows,

> a judgment is "final" even if pending on appeal. Restatement, Judgments 2d, § 13, Comments (b) and (f), § 16, Comments (a), (b) and (c). *See also Southern Pacific Communications Co. v. AT & T Co.*, 740 F.2d 1011, 1018 (D.C. Cir. 1984); *Huron Holding Corp. v. Lincoln Mine Operating Co.*, 312 U.S. 183, 189, 61 S.Ct. 513, 515, 85 L.Ed.2d 725, 730 (1941).

*Gregory Mktg. Corp. v. Wakefern Food Corp.*, 207 N.J. Super. 607, 621, 504 A.2d 828, 836 (Law. Div. 1985).[11]

Federal *res judicata* principles, which, like New Jersey's, follow the Restatement (Second) of Judgments, are in accord:

> "[T]he pendency of an appeal does not affect the potential for res judicata flowing from an otherwise-valid judgment." *Ross v. Meyer*, 741 F. App'x 56, 60 (3d Cir. 2018) (quoting *U.S. v. 5 Unlabeled Boxes*, 572 F.3d 169, 175 (3d Cir. 2009)). Therefore, despite a pending appeal, the Court correctly found the doctrine of res judicata applied.

*Stewart v. Brennan*, No. 319CV14923BRMLHG, 2020 WL 2060281, at *2 (D.N.J. Apr. 29, 2020); *see also Cohen v. Superior Oil Corp.*, 16 F. Supp. 221, 224 (D. Del. 1936), *aff'd*, 90 F.2d 810 (3d Cir. 1937).

---

[10]     Farah does not, by the way, state any valid basis for a serial motion for reconsideration, or give the court any reason to think that, at this late date, it contains anything new that would change the court's mind. Should that occur, it may be brought to the attention of this court or any appellate court. To be clear, this footnote is not intended and shall not be cited as an "invitation" to reconsideration.

[11]     *Gregory* was overruled, however, to the extent it held that a dismissal on standing grounds is a final judgment. *Watkins v. Resorts Int'l Hotel & Casino, Inc.*, 124 N.J. 398, 421, 591 A.2d 592, 603 (1991).

I therefore hold that the "FINAL JUDGMENT" in the 2018 foreclosure action is indeed a final judgment.

### c) *Same parties or privies*

The primary parties, Farah and Chase, are identical across the two actions. There can be no doubt that Chase has standing to assert claim preclusion or the entire controversy doctrine.

The remaining parties, La Salle as Trustee and MERS, must be in privity with Chase if they are to claim the benefit of claim preclusion. To some degree, privity must be inferred, because of a more basic failure to establish any relevant connection between these defendants and Chase. LaSalle as Trustee is not alleged to have made any fraudulent representation in connection with the loan.[12] Thus it is only as the assignee (or perhaps the defective assignee) of Chase or its predecessor, WaMu, that LaSalle as Trustee could be liable. MERS is still further removed. Because no factual allegations of fraud are made against MERS at all, *see* Section III.B.5, *infra,* the plaintiff's theory can only be a privity-based one that MERS is vicariously liable because it was the nominee of the true mortgagee, WaMu or Chase.

\*   \*   \*

In short, the 2018 foreclosure action judgment is *res judicata* because (1) there was a final judgment on the merits, (2) involving the same parties or their privies, and (3) this action is based on the same transaction or occurrence. *Watkins,* 124 N.J. at 412, 591 A.2d at 599. *A fortiori,* the entire controversy rule applies here to bar the claims of the AC, directly as to Chase, and also as to its privies, LaSalle as Trustee and MERS. *See Coleman v. Chase Home Fin., LLC ex rel. Chase Manhattan Mortgage Corp.*, 446 F. App'x 469 (3d Cir. 2011) (Fuentes, J.) (Mortgagor, following a final state court judgment of foreclosure, was barred from pursuing federal class action alleging, *inter alia,* that mortgagee charged

---

[12]    I set aside Farah's allegations of misbehavior within the 2014 litigation, dealt with in a separate opinion filed today on appeal from the ruling of the Magistrate Judge.

excessive fees); *Dennis v. MERS/Merscorp Mortgage Elec. Registration Sys., Inc.*, No. CIV.A. 11-4821 JLL, 2011 WL 4905711, at *1 (D.N.J. Oct. 13, 2011) (barring claims by plaintiff mortgagor, who had defaulted in state foreclosure action, that "as a result of defective assignments of her mortgage, all claims to the property are void").

### 2. Issue Preclusion (Collateral Estoppel)

Should there be any doubt, however, the related preclusion doctrine of collateral estoppel would independently bar the relitigation of the factual issues decided by the state court as to Chase, LaSalle as Trustee, and MERS. Chase may of course invoke it directly, because Chase and Farah were both parties to the 2018 foreclosure action. In contrast with claim preclusion case law, however, identity or privity of parties is not required. LaSalle as Trustee and MERS, although not parties to the foreclosure action, may invoke nonmutual collateral estoppel to preclude relitigation of factual issues decided against Farah in the state foreclosure action.[13]

### (i) Satisfaction of the five prerequisites

New Jersey follows the usual rule that collateral estoppel bars litigation of facts fully litigated and actually determined in a prior action, even one involving a different claim or cause of action. *See Tarus v. Pine Hill,* 189 N.J. 497, 520 (2007). The issue must (1) be identical to the one previously litigated; (2) have been actually litigated; (3) have been asserted in a case that went to judgment on the merits; (4) have been essential to the prior judgment; (5) be asserted against the same party, or one in privity. *See Twp. Of Middletown v. Simon,* 193 N.J. 228, 236 (2008). *Accord Allen v. V & A Bros., Inc.*, 208 N.J. 114, 137 (2011); *Olivieri v. Y.M.F. Carpet, Inc.*, 186 N.J. 511, 521 (2006)).

---

[13]    I have sometimes found the terms "offensive collateral estoppel" and "defensive collateral estoppel" confusing or inapt, if only because they do not always correspond to a party's status as plaintiff or defendant. Here, I will simply refer to the doctrine as "collateral estoppel." It is asserted against Farah in its "mutual" form by defendant Chase (because both were parties to the 2018 foreclosure action), and in its "nonmutual" form by defendants LaSalle as Trustee and MERS (because they were not parties to the 2018 foreclosure action).

Those five prerequisites are met here.

*First*, the issues in the 2018 foreclosure action are the same as those asserted here; and *Second*, they were actually litigated.

As noted in the summary above, Judge Berdote-Byrne decided legal *claims* (including counterclaims)*,* but those rulings were based on her summary judgment decision that there was no genuine, material factual *issues.* Thus, for example, she found that Farah had executed the 2008 loan documents. Chase was in possession of a true and correct original of the 2008 note and mortgage, and had submitted a valid certified copy. WaMu's assets, including the 2008 mortgage, were validly assigned to Chase by the FDIC, pursuant to an agreement and assignment which were before the court. Farah had been in default since August 1, 2010. Chase validly owned the 2008 loan (a) as bearer, because it adequately proved possession, and the documents were endorsed in blank; and (b) pursuant to the assignment recorded on December 22, 2014. The affirmative defenses attacking the chain of title were struck because they did not present a triable issue of fact. Chase had not committed fraud in the 2014 foreclosure action.

Counterclaims 1, 4, 5, and 6 alleged various forms of fraud, noting in particular an allegedly fraudulent "mortgage securitization scheme" (allegedly implicating LaSalle as Trustee, because the 2006 loan was not truly owned by Chase, but by a REMIC trust). The state court found no evidence, or even an adequate allegation, of fraud. The court also rejected the claim that title and other documents had been destroyed.

Judge Berdote-Byrne reviewed Farah's arguments in relation to fraud and the chain of title, and specifically noted that these were the same issues asserted "in the DNJ lawsuit," *i.e.,* this action, which was already pending. She rejected the allegations, *e.g.*, that La Salle as Trustee and not Chase was the true owner.

*Third,* the 2018 foreclosure action went to judgment on the merits. As noted above, the state court entered a final judgment, which was reaffirmed on

reconsideration and again in connection with the denial of a motion to dismiss. (DE 188-1, 190-2, 190-3.)

*Fourth,* the issues decided were essential to the state court's judgment. They were at the heart of Judge Berdote-Byrne's decision that there was no defect in Chase's title, whether based on "fraud" in connection with pledging the loan as part of a securitization, or otherwise.

*Fifth,* the issues are now asserted against Farah, the same party against whom they were decided in the prior state action.

> (ii)   *Fairness factors*

The requirement that the issue be asserted not by but "against" the same party or one in privity (here, Farah), reflects the modern view that mutuality of estoppel is not required. Collateral estoppel, however, particularly in its nonmutual form, requires the Court to examine a number of additional "fairness factors."

Nonmutual collateral estoppel has long been regarded as desirable in the federal system because it promotes judicial economy. *See Parklane Hosiery v. Shore*, 439 U.S. 322, 326–30, 99 S. Ct. 645 (1979); *Mann v. Estate of Meyers*, 61 F. Supp. 3d 508, 523 (D.N.J. 2014). New Jersey, too, long ago adopted the doctrine of nonmutual collateral estoppel. I cite the leading case of *Allesandra v. Gross*:

> Until recently [the court was writing in 1982] collateral estoppel was available only where there was mutuality of estoppel. The requirement of mutuality is no longer rigidly adhered to in this State. We have adopted the more flexible modern view, formulated by the American Law Institute as follows:
>
> > § 29. Issue Preclusion in Subsequent Litigation with Others
> >
> > A party precluded from relitigating an issue with an opposing party, in accordance with §§ 27 and 28, is also precluded from doing so with another person unless the fact that he lacked full and fair opportunity to litigate the issue in the first action or other circumstances justify affording him an opportunity to relitigate the issue.
>
> [Restatement, Judgments 2d, § 29 (1980)]

187 N.J. Super. 96, 104–05, 453 A.2d 904, 908–09 (App. Div. 1982).

Nonmutual collateral estoppel is scrutinized more closely than the conventional mutual variety. The five essential elements, cited above, must be satisfied. But "even if all five elements coalesce, it 'will not be applied when it is unfair to do so.'" *Allen*, 208 N.J. at 138 (quoting *Olivieri*, 186 N.J. at 521–22).

Fairness factors that weigh in favor of the application of nonmutual collateral estoppel include "conservation of judicial resources; avoidance of repetitious litigation; and prevention of waste, harassment, uncertainty and inconsistency." *Olivieri*, 186 N.J. at 523 (quoting *Pace v. Kuchinsky*, 347 N.J. Super. 202, 216, 789 A.2d 162 (App. Div. 2002)).

Fairness factors that weigh against the application of nonmutual collateral estoppel include the following:

> We agree with the Appellate Division's oft-repeated view that the determination whether administrative proceedings merit the deference accorded to final judgments is informed by the exceptions set forth in Restatement (Second) of Judgments § 28 (1982):
>
> > § 28 Exceptions to the General Rule of Issue Preclusion
> >
> > Although an issue is actually litigated and determined by a valid and final judgment, and the determination is essential to the judgment, relitigation of the issue in a subsequent action between the parties is not precluded in the following circumstances:
> >
> > (1) The party against whom preclusion is sought could not, as a matter of law, have obtained review of the judgment in the initial action; or
> >
> > (2) The issue is one of law and (a) the two actions involve claims that are substantially unrelated, or (b) a new determination is warranted in order to take account of an intervening change in the applicable legal context or otherwise to avoid inequitable administration of the laws; or
> >
> > (3) A new determination of the issue is warranted by differences in the quality or extensiveness of the procedures followed in the two courts or by factors relating to the allocation of jurisdiction between them; or

(4) The party against whom preclusion is sought had a significantly heavier burden of persuasion with respect to the issue in the initial action than in the subsequent action; the burden has shifted to his adversary; or the adversary has a significantly heavier burden than he had in the first action; or

(5) There is a clear and convincing need for a new determination of the issue (a) because of the potential adverse impact of the determination on the public interest or the interests of persons not themselves parties in the initial action, (b) because it was not sufficiently foreseeable at the time of the initial action that the issue would arise in the context of a subsequent action, or (c) because the party sought to be precluded, as a result of the conduct of his adversary or other special circumstances, did not have an adequate opportunity or incentive to obtain a full and fair adjudication in the initial action.

*Olivieri,* 186 N.J. at 523, 897 A.2d at 1010–11 (citing *Pace*, 347 N.J. Super. at 216); *see also Strassman v. Essential Images*, No. 2:17-CV-4227-KM-JBC, 2018 WL 1251636, at *7–8 (D.N.J. Mar. 12, 2018).

Positive considerations of efficiency, repose, and avoidance of inconsistency surely apply here. This matter has been aggressively litigated in two courts for five years. Further litigation of the same issues would be unduly repetitive.

The negative fairness factors, by contrast, have no application. Farah had a full and fair opportunity to litigate his claims of fraud, taking full advantage of the plenary procedures of the state court, which are equivalent to the procedures available here. There was no defect in those procedures, and appeal is available to Farah there. This federal action was far from unforeseeable; it was actually pending at the time of the state foreclosure action(s), and the state judge specifically invoked it in her summary judgment ruling. There is no other inconsistent judgment involving the same issues with regard to this mortgage, eliminating any opportunity for any party to "cherry

pick" a favorable precedent from among unfavorable ones.[14] I can perceive no error in the state court's ruling; it involved black-letter principles of foreclosure law, not novel doctrines that might require breathing space for development in the case law. Nor are there any intervening circumstances that have changed the legal or equitable landscape since Judge Berdote-Byrne very recently rendered her decisions.

More generally, Farah did not lack the incentive to litigate the state court action. *See Parklane Hosiery*, 439 U.S. at 330 ("If a defendant in the first action is sued for small or nominal damages, he may have little incentive to defend vigorously, particularly if future suits are not foreseeable.") Chase is Farah's primary antagonist; Farah had every incentive to, and did, press his claims and defenses in the foreclosure action brought by Chase, where the validity and entire outstanding balance of the mortgage were at stake.

*       *       *

In short, collateral estoppel, or issue preclusion, is properly applied here. It may be employed in mutual fashion by Chase, a party to the prior state court judgment against Farah. And, irrespective of privity, it may be employed nonmutually by LaSalle as Trustee and MERS. The facts as found by the state judge doom Farah's claims against them, because in each case the essential harm consists of acts that allegedly placed Chase in a position to enforce a mortgage it did not own—which Judge Berdote-Byrne found was not the case.

---

[14]    In Professor Currie's familiar example, a railroad collision injures 50 passengers all of whom bring separate actions against the railroad. After the railroad wins the first 25 suits, a plaintiff wins in suit 26. Professor Currie argues that offensive use of collateral estoppel should not be so applied as to allow plaintiffs 27 through 50 automatically to recover.

*Parklane  Hosiery*, 439 U.S. at 330 n.14 (citing Brainerd Currie, Mutuality of Collateral Estoppel: Limits of the Bernhard Doctrine, 9 Stan. L. Rev. 281, 285–86 (1957)); *see* Restatement (Second) of Judgments § 88(4). No such cherry-picking stratagem is apparent, or even available, here.

### B. Other Grounds

Because *res judicata* doctrines bar these claims, it is unnecessary to
devote full attention to Defendants' other grounds for summary judgment,
which were initially asserted before there was a final judgment in the 2018
foreclosure action. In his response, Mr. Farah has failed to comply with the
local rules; for example, he has not responded to Defendants' statement of
material facts or submitted a counterstatement of his own, with appropriate
citations to the record. I cannot accept at face value imputations of fraud in a
brief. I nevertheless consider whether the evidence of record and the
submissions I do possess entitle the Defendants to summary judgment. *See*
Section II, *supra.*

The AC alleges a single claim of fraud, although it has several aspects.
The elements of fraud are "(1) a material misrepresentation of a presently
existing or past fact; (2) knowledge or belief by the defendant of its falsity; (3)
and intention that the other person rely on it; (4) reasonable reliance thereon
by the other person; and (5) resulting damages." *Gennari v. Weichert Co.
Realtors,* 148 N.J. 582, 610, 691 A.2d 350 (1997).[15]

As to the chain of title, Chase has a fairly simple, well-documented story
to tell. Farah took out this loan, secured by a recorded mortgage, in 2006. That
2006 loan was satisfied and discharged in connection with the 2008
refinancing. (Berg Cert. Ex. B, recorded Satisfaction, Cancellation and
Discharge of Mortgage, DE 168-4.) Farah refinanced the loan in 2008, *via* a
new note and mortgage with WaMu. When WaMu failed, its assets were taken
over by the FDIC. The FDIC conveyed WaMu's loan assets, including the 2008

---

[15]      The AC, while clearly labeling its cause of action as fraud, also makes a passing
reference to the New Jersey Consumer Fraud Act ("NJCFA"). That cause of action
under the NJCFA was asserted as Counterclaim number 6 in the 2018 foreclosure
action and denied on summary judgment. (2018 SJ Op. 16–17, discussed at p. 19,
*supra.*) Defendants, in their original, pre-judgment summary judgment motion, also
argued that the relevant allegations of fraud relate to securitization and/or debt
collection, not to the "sale or advertisement of any merchandise or real estate." N.J.
Stat. Ann. § 56:8-2. It is unnecessary to reach that contention.

loan, to Chase. Farah defaulted in 2010, and has made no monthly payments for ten years. For part of this period he occupied the property, and for part of the period has rented out the property for $5300 per month.

Farah expresses bafflement as to who owns the loan, and tells a complex, poorly documented tale of faulty assignments and fraudulent securitizations. These, however, relate primarily if not solely to the defunct 2006 loan. As to that loan, however—and certainly as to the operative 2008 loan—he has never faced dueling mortgagees or been subjected to duplicate or conflicting obligations. He was billed by, and paid, WaMu and then Chase, before he stopped paying altogether. Farah claims to have been defrauded because the owner of the loan pledged it as part of a securitization, but the securitization had no effect on his obligations. In short, it is difficult to discern the substance of the alleged fraud, or to ascertain precisely what this defaulting borrower thinks he has been defrauded of.

Defendants have aptly summarized the convoluted allegations of the AC as boiling down to four essential claims:

(1) alleged wrongdoing relating to the origination of two loans to Farah originated by WaMu in 2006 and refinanced by WaMu in 2008;

(2) alleged violations of the P&A Agreement between Chase and the FDIC;

(3) claims regarding three alleged assignments of the mortgage for the 2006 loan; and

(4) alleged issues regarding securitization of the 2006 loan, including violation of the PSA.

### 1. WaMu-related fraud claims

To some extent that Mr. Farah asserts claims of fraud in connection with the origination of the loan by WaMu. The AC alleges, for example, that WaMu

in its underwriting process should have verified his income and recognized that he could not afford the loan. This claim has several problems.

First, WaMu failed and was taken over by the FDIC, which assigned its assets to Chase. As directed to WaMu, any such claim would be subject to the FDIC administrative exhaustion requirements contained in FIRREA:

> [N]o court shall have jurisdiction over—
>
> (i) any claim or action for payment from, or any action seeking a determination of rights with respect to, the assets of any depository institution for which the Corporation [*i.e.,* the FDIC] has been appointed receiver, including assets which the Corporation may acquire from itself as such receiver; or
>
> (ii) any claim relating to any act or omission of such institution or the Corporation as receiver.

12 U.S.C. § 1821(d)(13)(D)(ii); *Fed. Deposit Ins. Corp. v. Shain, Schaffer & Rafanello,* 944 F.2d 129, 132 (3d Cir. 1991). I agree with Farah, however, that any allegedly fraudulent actions by Chase, *after* it obtained the loan by assignment, lie beyond the scope of the cited FIRREA provision.

 Second, a fraud claim arising from the underwriting of the 2006 loan (or, for that matter, the 2008 refinancing) would be barred by the six-year statute of limitations. N.J. Stat. Ann. § 2A:14-1.

It is undisputed that the 2006 loan was originated on April 26, 2006; the 2008 refinancing loan on January 17, 2008; and the 2006 loan was discharged of record on February 11, 2008. (Gregada Cert. ¶¶ 3–4; Berg Decl. ¶ 4) The complaint in this action was filed on April 10, 2015.

Nor would the "discovery rule" save such allegations. *See Lopez v. Swyer,* 59 N.J. 361, 300 A.2d 563 (1973) (cause of action may be held not to accrue until the plaintiff party discovers, or by exercise of reasonable diligence should have discovered, the facts that are the basis for the claim). Even if Farah exaggerated his income on the loan application, he necessarily knew his true

income at the time, was aware of the terms of the loans, and certainly knew then or very shortly thereafter whether he could afford them.

Third, as regards claims in relation to the 2006 loan, there is no genuine dispute that this loan was satisfied and discharged of record in connection with the 2008 financing. (Berg Cert. Ex. B, recorded Satisfaction, Cancellation and Discharge of Mortgage, DE 168-4.) The AC fails to connect its claims of fraud in connection with the 2006 loan to any present injury.

### 2. P&A Agreement

Farah alleges fraud in connection with any representation that the P&A Agreement transferred his 2008 loan from the FDIC to Chase. Only "certain" assets, he says, were transferred.

The P&A Agreement governed the FDIC's transfer of WaMu's former assets, including this loan, to Chase. The 2008 note and mortgage were within the scope of assets transferred to Chase pursuant to Section 3.1 of that agreement. (Grageda Cert. ¶ 12 and Ex. H, DE 168-10.) Indeed, many cases have already recognized that this very P&A Agreement assigned all of WaMu's loans and loan commitments to Chase; I cite only some examples from this District. *See, e.g., Purpura v. JPMorgan Chase,* 2018 WL 1837952 (D.N.J. April 18, 2018); *Siwulec v. Chase Home Fin., L.L.C.,* 2010 WL 5071353 (D.N.J. Dec. 7, 2010); *Giannoto v. IRS (In re Sywilok),* 2016 Bankr. LEXIS 3016 at *8–*9 (D.N.J. Dec. 7, 2010).

More specifically, Farah claims that the transfer was not valid because it required a "Receiver's Deed and Receiver's Bill of Sale." I reject that contention for the reasons given by Judge Berdote-Byrne in the 2018 foreclosure action. (*See* p. 17, *supra*; 2018 SJ Op. at 10–11.) Such a deed and bill of sale was not a prerequisite to assignment.

### 3. Assignments

As the state court held, Farah raised no factual issue as to the actual, relevant, recorded assignment of the 2008 loan. That assignment from FDIC to Chase was recorded on December 22, 2014. (2018 SJ Op. at 3–4, 8; Grageda Cert. 5, Ex. C, DE 168-5.) As noted above, however, the AC alleges that three assignments of the loan are indicative of "fraud." These allegations appear to relate to the defunct 2006 loan. For that reason alone, their significance would be doubtful at best.

The three other alleged assignments cited in the AC tell a puzzling story. They appear to relate to the defunct 2006 loan. They have not been produced in discovery, and I must conclude that there has been a failure of proof. The AC cites these assignments, or perhaps hypothesizes that they exist, in each case giving the Instrument Numbers for the "Official Records of Morris County."

Defendants have attempted to track down the identified documents in the Morris County records. As it turns out, the cited documents are not assignments of mortgage, and they do not relate to the properties at issue. (Berg. Decl. ¶ 14 and Exs. L–O, DE 168-14, 15, 16, & 17.)

- AC ¶¶ 130–31 refer to an assignment of mortgage recorded August 16, 2012, Instrument No. 2012008438. That document, No. 2012008438, is a cancellation of mortgage lien, apparently related to a home equity credit line on someone's property in Washington, NJ. (DE 168-14.)
- AC ¶¶ 158–59 refer to an assignment of mortgage recorded June 4, 2014, Instrument no. 2014047378. That document, no. 2014047378, is a designation of a new notary public. (DE 168-15.)
- AC ¶¶ 172–73 refer to an assignment of mortgage recorded June 24, 2014, Instrument No. 2014055278. That document, No. 2014055278, is a discharge of mortgage for a couple named Getchis. (DE 168-16.)

Defendants also submit an abstract of Morris County filings on which the name James Farah appears. The three assignments of mortgage cited in the AC do not appear there. (Berg. Decl. Ex. O, DE 168-17.)

In any event, positing these assignments and characterizing them as a fraud scheme does not advance Farah's position. Given the direct transfers of the 2008 loan from WaMu to FDIC, and from FDIC to Chase, these alleged assignments have not been shown to have any significance. Nor does Farah suggest how, assuming they exist, these assignments fraudulently deprived him of anything.

### 4. Securitization

The AC asserts claims of fraud arising from the placement of the loan—the 2006 loan, apparently, although this is not always expressed clearly—in a trust as part of a securitization. As repeatedly noted, the 2006 loan is literally history; it was discharged in connection with the 2008 refinancing.

In his brief, Farah denies the discharge in conclusory terms, connecting it to Chase's alleged lack of standing to foreclose. The evidence of this publicly-recorded discharge is clear, however. (Berg Cert. Ex. B, recorded Satisfaction, Cancellation and Discharge of Mortgage, DE 168-4.) It is also plausible; the 2008 refinance could not have occurred without cancellation of the prior 2006 loan. In short, the 2008 loan is the operative one.

In addition, Farah fails to establish that he has standing, or possesses a cause of action, with respect to the securitization or any alleged violation of the associated PSA. He was not a party to that agreement, which did not affect him or his loan obligations in any manner. He charges "identity theft"; the allegation seems to be, roughly, that his name was taken in vain as mortgagor in connection with the securitization. That, if it occurred, does not constitute or confer standing as to any claim of a knowingly false statement, reliance thereon, and resulting damages.

Analogous claims by mortgagees have been frequently asserted, and very nearly as frequently rejected on the merits:

> Gilarmo argues . . . that U.S. Bank as Trustee lacked standing to foreclose on her property because the Mortgage was not properly assigned to the Trust in accordance with the Pooling Service Agreement ("PSA") . . . . [A] borrower in default has no standing to challenge an assignment said to violate a pooling service agreement like the one at issue here.

> When measured against this overwhelming legal precedent,[16] we are not persuaded that Gilarmo may challenge U.S. Bank's standing based on alleged non-compliance with the documents governing the trust.  Gilarmo is not a party to the PSA nor a third-party beneficiary of the PSA, and her injuries are hypothetical. She admits that she took out the loan, that she is in default, and she does not argue that she ever paid more than the amount due on her loan, or that she received a bill or demand from any entity other than the defendants. She does not allege that the allegedly improper transfer interfered with her ability to pay the Note, or that the original lender would have refrained from foreclosure under the circumstances. It seems plain enough here that the allegedly improper assignment merely substituted one creditor for another, without changing her obligations under the Note.

*Gilarmo v. U.S. Bank N.A. ex rel. CSB Mort. Backed Tr. 2006-1*, 643 F. App'x 97, 100–01 (3d Cir. 2016). *See also Eun Ju Song v. Bank of Am., N.A.,* No. 2:14-2104, 2015 WL 248436 (D.N.J. Jan. 20, 2015); *HSBC Bank USA Nat'l Ass'n v. Mann,* No. F-21680-122015, 2015 WL 6456042 (N.J. Super. App. Div. Oct. 27, 2015) (mortgagor is not party to or third-party beneficiary of PSA, so any noncompliance does not affect the validity of the foreclosure).

---

16    As support, *Gilarmo* cited *Rajamin v. Deutsche Bank National Trust Co.,* 757 F.3d 79, 88 (2d Cir. 2014); *Reinagel v. Deutsche Bank National Trust Co.,* 735 F.3d 220, 228 & n.29 (5th Cir. 2013); *Correia v. Deutsche Bank National Trust Co. (In re Correia),* 452 B.R. 319, 324-25 (1st Cir. BAP 2011).

### 5. Claims against MERS

Mortgage Electronic Registration Systems, Inc. ("MERS") must be dismissed from the action. Farah has produced no evidence of any fraud committed by MERS, whether as a principal or a culpable participant. Indeed, it does not appear that the AC even alleges any facts suggesting a fraud by MERS.

MERS is an electronic registry that tracks mortgage ownership and servicing rights. For convenience, a lender can designate MERS as the nominal mortgagee in recorded filings, thus permitting transfers of underlying interests without the need to re-record such transactions. *See, e.g., Deutsche Bank Nat'l Tr. Co. v. Vezeriannis,* No. A-1376-11T1, 2013 WL 3213627 (App. Div. June 27, 2013) (citing *Bank of N.Y. v. Raftogianis,* 418 N.J. Super. 323, 332 (Ch. Div. 2010). There is nothing inherently fraudulent about this arrangement, and Farah fails to elicit any further facts that suggest fraud, or even participation, by MERS.

The AC alleges the following facts in relation to MERS: that it conducts business in Morris County (AC ¶ 10); that it is a Delaware corporation with its headquarter in Virginia (AC ¶ 11); and that, on information and belief, "MERS is the purported Nominee under the original Mortgage executed by Plaintiff, and is a participant in the fraudulent recordings filed of record on Morris County, as more particularly described *Infra.*" (AC ¶ 12.)

I have already discussed and discounted the allegations of "fraudulent recordings filed of record in Morris County" in the preceding subsection. In addition, Farah points to nothing in the factual record to back up his allegations on information and belief concerning the involvement of MERS. The mortgagee of both loans was WaMu.

 In short, there is no sufficient evidence that MERS had any involvement whatever in any of the acts alleged to be fraudulent.

**CONCLUSION**

Defendants' motion for summary judgment (DE 168, as supplemented, DE 190), pursuant to Fed. R. Civ. P. 56, is GRANTED on grounds of *res judicata* and the entire controversy doctrine. *See* Section III.A. In the alternative, it is granted based on certain other grounds asserted by Defendants. *See* Section III.B.

Dated: May 18, 2020

/s/ Kevin McNulty

_____
KEVIN MCNULTY
United States District Judge